**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **THE HILB GROUP OF**<br>**NEW YORK, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. _____** |
| **v.** | ) | |
| | ) | |
| | ) | |
| **ASSOCIATED AGENCIES, INC.** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **GREGORY RING,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## VERIFIED COMPLAINT

Plaintiff The Hilb Group of New York, LLC ("THG-NY" or "Plaintiff"), by counsel, sets forth the following as its Verified Complaint (the "Complaint") against Defendants Associated Agencies, Inc. ("Associated") and Gregory Ring ("Ring" and, collectively with Associated, "Defendants") for breach of contract and tortious interference with contractual relations.

## INTRODUCTION

1.      This is an action to stop unfair competition by a competing insurance brokerage and a skilled and experienced insurance broker.  Before his employment with THG-NY and its predecessor, Rampart Brokerage Corporation & Affiliates ("Rampart"), Ring had no experience in the insurance brokerage industry, no customer relationships, and no customer goodwill.  Using first Rampart's—and then THG-NY's—training, support, and industry goodwill, Ring developed into a top insurance producer supporting a book of business of nearly $750,000.00 in annual revenue for THG-NY.  When THG-NY refused to sell that book of business to Ring's new

1

employer, Associated, Ring and Associated decided to steal it in violation of Ring's restrictive covenant obligations to THG-NY.  They have successfully stolen multiple accounts already, including one of the largest THG-NY paid Ring to develop.  Defendants thus have left THG-NY with no choice but to seek redress from this Court to (1) enjoin Ring from continuing to ignore his contractual obligations; (2) enjoin Associated from tortiously interfering with the Restrictive Covenant Agreement; and (3) award damages for the injuries Defendants already have caused.

## PARTIES

2.      THG-NY is a Delaware limited liability company, which does business in the State of New York as Rampart Insurance Services, and is a subsidiary of The Hilb Group, LLC ("THG"). THG-NY is authorized to conduct business in New York, and maintains an office at 1983 Marcus Avenue, Suite C130, Lake Success, NY 11042.

3.      THG-NY's sole member is The Hilb Group Operating Company, LLC, which is a Delaware limited liability company.

4.      The Hilb Group Operating Company, LLC's sole member is THG, which is a Delaware limited liability company.

5.      THG's sole member is THG Intermediate, LLC, which is a Delaware limited liability company.

6.      THG Intermediate, LLC's sole member is THG Acquisition Company, LLC, which is a Delaware limited liability company.

7.      THG Acquisition Company, LLC's sole member is Harpoon Bidco, Inc., which is a Delaware corporation with its principal place of business in Virginia.

8.      Associated is an Illinois corporation with its principal place of business in Illinois. Associated is registered to do business in the State of New York and may be served with process

through National Corporate Research, Ltd., 122 East 42nd Street, 18th Floor, New York, NY 10168.

9.      Upon information and belief, Ring is a resident and domiciliary of the State of Illinois who resides and may be served with process at 215 Lakeside Place, Highland Park, Illinois 60035.

10.      Plaintiff purchased Rampart's assets, including all its customer accounts and associated goodwill, effective December 1, 2020, after which Ring worked for THG-NY as a Producer until his resignation on June 21, 2022.

## JURISDICTION & VENUE

11.      Ring executed a Producer Employment Agreement and a Confidentiality and Non-Solicitation Agreement (collectively, the "Restrictive Covenant Agreement")—which form the basis of this lawsuit—effective December 1, 2020.  A copy of the Restrictive Covenant Agreement is attached as **Exhibit 1**.

12.      This Court has personal jurisdiction over Ring because the Restrictive Covenant Agreement provides: "[T]he Company and [Ring] hereby consent to the jurisdiction of the courts of the State of New York and of the United States District Courts located in the State of New York (to the extent such courts have subject matter jurisdiction) in connection with any action, suit, or other proceeding in connection with, arising out of, or relating to this Agreement, and agree not to assert in any such action, suit, or proceeding that it or he is not personally subject to the jurisdiction of such courts, that the action, suit, or proceeding is brought in an inconvenient forum, or that venue of the action, suit, or proceeding is improper."  Restrictive Covenant Agreement, p. 14, ¶ 14.

13.      This Court has personal jurisdiction over Associated under Fed. R. Civ. P. 4(k) and

N.Y. Civil Practice Law § 302 because Associated transacts business within the State of New York and/or contracts to supply goods or services in the State of New York.

14.     This Court also has personal jurisdiction over Associated under Fed. R. Civ. P. 4(k) and N.Y. Civil Practice Law § 302 because Associated committed a tortious act outside the State of New York causing injury to THG-NY within the State of New York and because Associated (i) regularly does or solicits business in the State of New York; and/or (ii) should reasonably expect the tortious act to have consequences in the State of New York and derives substantial revenue from interstate commerce.

15.     This Court's assertion of personal jurisdiction over Associated is consistent with the Due Process Clause of the Constitution.

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000 (exclusive of interest and costs) and is between citizens of different states.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(3) because Ring and Associated are subject to this Court's personal jurisdiction with respect to this lawsuit.

## FACTUAL BACKGROUND

### THG-NY's Business and Customer Relationships

18.     THG-NY is, among other things, in the employee group benefits brokerage and administration business. Specifically, THG-NY partners with business owners to broker and administer a range of customized insurance and risk management programs, including middle-market commercial lines, high net worth personal lines, and individual and group benefits.  THG-NY also provides consulting services to assist customers with designing and servicing insurance

and risk management plans and programs.  Generally, THG-NY renews policies with its customers on an annual or bi-annual basis.

19.     In part due to its cyclical nature, the insurance brokerage and risk management business is extremely competitive.  Accordingly, success in the industry depends in large part on customer relationships and goodwill.  Once a customer discontinues its policy or consulting relationship with a particular broker, the customer is unlikely to return.

20.     Moreover, an agency's insurance brokerage and risk management business often is grown through referrals.  As such, the loss of one customer's relationship has a ripple effect of harming the agency's future ability to grow and to compete in the marketplace.

## Ring's Employment with THG-NY

21.     Rampart hired Ring as a Sales Associate in January 2015.

22.     Before his employment with Rampart, Ring did not have any experience in the insurance brokerage and risk management industry.  He did not bring any pre-existing customer relationships to Rampart but instead developed customer relationships using the training, skills, and goodwill Rampart provided to him.

23.     Ring's duties for Rampart included soliciting and brokering sales of insurance and other products to new and existing customers, selling and providing consulting services, managing existing customer relationships, assisting customers with renewals, assisting customers with claims, and providing other services to ensure customer satisfaction.

24.     Because of the highly competitive nature of its business, THG and its affiliated entities, including THG-NY, frequently engage in strategic acquisitions to strengthen their position in the marketplace.  THG is primarily an acquisition company, which pays market consideration for its various insurance asset acquisitions.

5

25.     Effective December 1, 2020, THG-NY purchased substantially all of Rampart's assets through an asset purchase agreement.

26.     At the time of the Rampart acquisition, Ring worked for Rampart as a Sales Associate.

27.     In the Rampart acquisition, THG-NY acquired all of Rampart's client accounts and relationships, including all insurance expirations and rights of renewal and all the associated goodwill, confidential information, files, claim files, books, records, ledgers, correspondence, and other records.

28.     THG-NY's acquisition included Rampart's entire book of business, including the accounts and goodwill associated with the customers which Ring obtained, serviced, and supported for Rampart.

29.     Immediately following the Rampart acquisition, THG-NY began integrating Rampart's business.  The integration process included transitioning Rampart's customer accounts to THG-NY.

30.     As a function of the Rampart acquisition, Ring's employment with Rampart ended, and he agreed to become a Producer for THG-NY.

31.     Ring executed the Restrictive Covenant Agreement as a condition of his employment with THG-NY.

32.     As a Producer, Ring served in a client-facing role for THG-NY.  His duties included soliciting and brokering sales of insurance and other products to new and existing customers, selling and providing consulting services, managing existing customer relationships, assisting customers with renewals, assisting customers with claims, and providing other services to ensure customer satisfaction.

33.     Ring developed and maintained extensive client relationships and contacts with THG-NY's customers, including the customers THG-NY acquired in the Rampart acquisition. Additionally, as a THG-NY employee, Ring had extensive access to information about strategies and practices THG-NY put in place to achieve success.  Ring had knowledge of and access to, among other things, THG-NY's customers, as well as knowledge and access to their renewal dates, pricing, preferences, and other non-public confidential information.

34.      Success in the insurance brokerage and risk management industry is predicated on solid relationships with customers.  As such, as a THG-NY employee, Ring developed and maintained strong relationships with THG-NY's customers, including the customers THG-NY acquired in the Rampart acquisition.

## THG-NY's Efforts to Protect Its Customer Relationships and Goodwill

35.     Customer relationships and goodwill are of the utmost importance in THG-NY's industry.  Accordingly, THG-NY invests substantial resources into its brokers and other business producers to establish goodwill and strong relationships with customers.  This makes THG-NY vulnerable to brokers and other business producers who can leverage those relationships.

36.     As such, THG-NY has a legitimate business interest in protecting its confidential information, relationships with customers and prospective customers, and customer goodwill, including the confidential information, relationships and goodwill it acquired in the Rampart acquisition.

37.     To protect these legitimate business interests, and as a condition of his employment with THG-NY, THG-NY required Ring to execute the Restrictive Covenant Agreement effective December 1, 2020.  Ex. 1.

38.    Ring acknowledged that his execution of the Restrictive Covenant Agreement was a condition precedent to his employment with THG-NY. Ex. 1, p. 2 at ¶ 8; *id.*, p. 7 at ¶ 2.

39.    In the Restrictive Covenant Agreement, Ring agreed that "while employed with [THG-NY], [he] will not perform any activities or services, or accept such other employment, which would present a conflict of interest with [his] employment with [THG-NY]." Ex. 1, p. 1 at ¶ 3.

40.    Ring also acknowledged that "[w]hile employed by [THG-NY], [he] will serve in a position of trust and confidence and will owe to [THG-NY] the duties of loyalty and of a fiduciary until the employment relationship is terminated." *Id.*, p. 2 at ¶ 7.  Ring expressly "accept[ed] and acknowledge[d] [his] fiduciary duties and duties of loyalty to [THG-NY]." *Id.*

41.    Additionally, when he executed the Restrictive Covenant Agreement, Ring acknowledged that, by virtue of his employment with THG-NY, he would have extensive contacts with THG-NY's customers and would benefit from THG-NY's customer relationships and goodwill.  Ex. 1, p. 7.

42.    Ring further recognized that THG-NY expended considerable effort and expense to develop its customer relationships, which relationships are a major part of THG-NY's value. *Id.*, p. 9 at ¶ 4.

43.    Accordingly, he agreed that THG-NY has a reasonable, necessary, and legitimate business interest in protecting the customer relationships which he serviced and supported as a THG-NY employee.  *Id.*, p. 10 at ¶ 8.

44.    To protect those necessary and legitimate business interests, the Restrictive Covenant Agreement requires Ring to abide by certain non-solicitation obligations. *Id.*, p. 9 at ¶ 4.

45.     In the Restrictive Covenant Agreement, Ring agreed that, during his THG-NY employment, and for two (2) years following the cessation of his employment with THG-NY, he would not, directly or indirectly, on behalf of himself or on behalf of any other individual or entity:

A.     contact, solicit, or assist in the solicitation of any of the Company's Customers or Active Prospective Customers (as each term is defined below) for the purpose of selling or providing any Competitive Products or Services (as defined below);

B.     sell or provide any Competitive Products or Services (as defined below) to any of the Company's Customers or Active Prospective Customers (as each term is defined below); or

C.     intentionally induce or attempt to induce any of the Company's Customers to cease doing business in whole or in part with the Company.

*Id.*

46.     The Restrictive Covenant Agreement defined "Competitive Products or Services" as "any services or products competitive with any product or service sold, offered for sale, or under development by the Company as of the date of [Ring's] termination of employment, provided [Ring] performed job duties for any Hilb Company related to such products or services or [Ring] otherwise acquired Confidential Information regarding such products or services during [Ring's] employment." *Id.*

47.     Under the Restrictive Covenant Agreement, "Customer" means "as of the date of termination of [Ring's] employment, any individual or entity that is a customer of the Company: (i) with whom [Ring] had any contact, communication, or for whom [Ring] had supervisory, sales or service responsibility within the last twenty-four (24) months of [Ring's] employment with the Company; or (ii) about whom [Ring] learned Confidential Information." *Id.*

48.     At the time Ring executed the Restrictive Covenant Agreement, he was fully aware of the non-solicitation and other contractual obligations it imposed on him.

49.     At all times, Ring has remained fully aware of the non-solicitation and other contractual obligations the Restrictive Covenant Agreement imposed on him.

50.     Non-solicitation covenants, such as those in the Restrictive Covenant Agreement, are common for producers and other "client-facing" positions in the insurance brokerage and risk management business.

### Ring Breaches His Fiduciary Duties and Contractual Obligations to THG-NY

51.     Using the training, resources, relationships, and goodwill THG-NY (and its predecessor) provided, Ring developed into a high-level Producer with a substantial book of business worth nearly $750,000.00 in annual revenue.  A significant portion of the customers Ring serviced for THG-NY, including the largest account, Cardworks, Inc., are based in New York.

52.     THG-NY paid Ring well for his services, including commissions of forty percent (40%) of new net revenue attributable to Ring and twenty-five percent (25%) of renewal net revenue attributable to Ring.

53.     Ring, however, decided to seek new employment, and to use the customer relationships and goodwill THG-NY (and its predecessor) had paid him to develop, to obtain that new employment.

54.     Upon information and belief, in the Summer of 2022, Ring began negotiating with Associated to join Associated as a Producer or in a similar client-facing, business generating role.

55.     Associated, like THG-NY, is in the insurance brokerage, administration, and consulting business.  Like THG-NY, Associated collaborates with businesses and individuals locally and nationally to provide a variety of customized insurance plans and ongoing risk management services.  Associated competes directly with THG-NY for customers in overlapping markets, including in New York.

56.     Upon information and belief, during Associated's recruitment of Ring, Ring provided Associated with a copy of the Restrictive Covenant Agreement.  As such, Associated was aware of Ring's non-solicitation and other contractual obligations to THG-NY before it offered him employment.

57.     Additionally, Associated reasonably knew or should have known that Ring was subject to non-solicitation and other contractual obligations to THG-NY before it offered him employment because restrictive covenant agreements for producers are common in the insurance brokerage and risk management industry.

58.     Ring's Restrictive Covenant Agreement did not deter Associated from offering Ring employment as a Producer or similar business generating role.

59.     To the contrary, Associated wanted to hire Ring not only for the skills he developed at THG-NY but also for the client accounts he serviced for THG-NY and which he potentially could bring to Associated.  Associated, however, was not willing to wait two years for Ring to try to move those accounts from THG-NY to Associated or let the Restrictive Covenant Agreement stop Associated from trying to obtain the accounts.

60.     Upon information and belief, to entice Ring to accept its employment offer, Associated advised Ring that it would be able to purchase the book of business he serviced from THG-NY, and thus avoid his non-solicitation obligations.

61.     Upon information and belief, to further entice Ring to accept its employment offer, Associated also assured Ring that it would pay for Ring's costs of defense if THG-NY tried to enforce his restrictive covenant obligations through litigation.

62.     Given Associated's assurances, Ring accepted Associated's offer of employment.

63.     Upon information and belief, Associated and Ring conspired to move the accounts he serviced for THG-NY to Associated immediately—and even before his resignation from THG-NY—because they hoped to avoid Ring's non-solicitation obligations.

64.     Upon information and belief, Associated also did not want the Restrictive Covenant Agreement to deter Ring from trying to move THG-NY's customers to Associated and wanted to ensure that Ring could bring THG-NY's customer accounts to Associated even if Associated was not successful in purchasing those accounts from THG-NY.

65.     Ring followed Associated's instructions and, unbeknownst to THG-NY, began soliciting THG-NY's customers to move their business to Associated before he resigned from THG-NY.

66.     Ring resigned from employment with THG-NY on June 21, 2022—effective immediately and without notice.

67.     Upon information and belief, Associated instructed Ring not to give THG-NY advance notice of his resignation.

68.     When he resigned, Ring informed THG-NY that he had accepted employment with Associated.  Ring also indicated that Associated was willing to purchase the client accounts he serviced from THG-NY.

69.     Upon information and belief, Ring disclosed THG-NY's Confidential Information about these accounts to Associated while he was still an employee of THG-NY, to facilitate the possible purchase of the accounts, and their theft if purchase was not possible.

70.     Ring's THG-NY supervisor—Gary Morris ("Morris")—informed Ring that THG-NY likely was not interested in selling any book of business to Associated.

71.     On June 22, 2022–the day after Ring's sudden resignation—Morris received a telephone call from Associated's President, Joshua Herz ("Herz"), with an offer to purchase the book of business Ring serviced for THG-NY.

72.     Associated contacted Morris immediately after Ring resigned because it knew of Ring's Restrictive Covenant Agreement before it hired him and wanted to purchase the book of business before THG-NY learned of Ring's unlawful solicitations.

73.     Indeed, Morris specifically asked Herz whether Herz was aware of Ring's Restrictive Covenant Agreement.

74.     Herz responded that he was aware of Ring's Restrictive Covenant Agreement and that the agreement was the reason Associated wanted to purchase the book of business.

75.     By offering to purchase the book of business, Associated acknowledged that the customer revenue and goodwill associated with the book belonged to THG-NY and not to Ring.

76.     By offering to purchase the book of business, Associated also acknowledged that it knew of Ring's Restrictive Covenant Agreement before it hired him and hoped avoid his restrictive covenant obligations by purchasing the book of business.

77.     THG-NY decided to decline Associated's offer because it was not interested in selling the book of business at the price Associated offered.  The book of business—with its annually recurring revenue—was worth far more than Associated had offered.

78.     THG-NY's rejection of Associated's offer, however, did not deter Associated or Ring from trying to move the book of business from THG-NY to Associated.  Indeed, Associated and Ring did not even wait for THG-NY to respond to Associated's offer.  Defendants already put their scheme into motion before Associated made the offer.

79.     On June 24, 2022, THG-NY sent a letter to Ring attaching the Restrictive Covenant Agreement and reminding him of his contractual obligations to THG-NY.  A copy of the letter is attached as **Exhibit 2**.  THG-NY also sent a copy of the letter to Associated.

80.     When it sent the letter, THG-NY did not know that Ring already had solicited THG-NY's customers to move their accounts to Associated—even before his resignation from THG-NY.  THG-NY, however, soon learned of Defendants' unlawful actions.

81.     On June 27, 2022, THG-NY received a letter—dated June 22, 2022—addressed to Chubb Insurance Companies stating: "Effective immediately, please recognize Auto & Home Insurance Agency, Inc. as the broker of record for [Robyn Morgenstern's and Szymon Rosenblatt's Auto and Home and Valuable Articles Policies]."  A copy of the letter is attached as **Exhibit 3**.

82.     Auto & Home Insurance Agency, Inc. is an affiliate of Associated.

83.     Robyn Morgenstern and Szymon Rosenblatt are "Customers," as that term is defined in the Restrictive Covenant Agreement.  THG-NY wrote the policies referenced in the letter in April and June 2022.  Ring did not have any business relationship with Robyn Morgenstern and Szymon Rosenblatt before his employment with THG-NY (or its predecessor) and developed that relationship using THG-NY's resources and goodwill, and while on THG-NY's payroll.  In fact Ring first sold policies to this account just a few weeks before his sudden resignation.

84.     Upon information and belief, Ring solicited Robyn Morgenstern and Szymon Rosenblatt to move their policies from THG-NY to Auto & Home Insurance Agency, Inc. while still employed by THG-NY.

85.     Upon information and belief, Ring wanted to make sure that, even if THG-NY declined to sell the book of business to Associated, he could move these accounts to THG-NY regardless of his contractual and other legal obligations to THG-NY.

86.     Upon information and belief, Associated was aware of, and encouraged and directed, Ring's illegal activities, including by its receipt, analysis and use of THG-NY's Confidential Information about such accounts to negotiate with, recruit and ultimately hire Ring.

87.     Upon information and belief, Ring (or someone on his behalf) drafted the letter attached as Exhibit 3 before his resignation from THG-NY but dated it for June 22, 2022—the day after his resignation.

88.     Upon information and belief, Ring instructed Robyn Morgenstern and Szymon Rosenblatt to wait until after his resignation from THG-NY to send the letter to Chubb Insurance Companies.

89.     On June 30, 2022, THG-NY sent Ring a second letter—this time demanding that he comply with his contractual and other legal obligations to THG-NY and confirm his compliance by July 6, 2022.  A copy of the letter is attached as **Exhibit 4**.  THG-NY also sent a copy of the letter to Associated.

90.     The following day, THG-NY received an e-mail from Cincinnati Insurance Company, attaching a letter to Cincinnati Insurance Company from Cardworks, Inc.  The letter, which was dated June 21, 2022, stated: "Effective immediately please recognize Associated Agencies, Inc., Suite #700, Rolling Meadows, IL 60008, as our Broker of Record for [Cardworks, Inc.'s Package, Workers Compensation, and Automobile Policies]."  A copy of the letter is attached as **Exhibit 5**.

91.     Cardworks, Inc. is a "Customer," as that term is defined in the Restrictive Covenant Agreement.  Ring did not have any business relationship with Cardworks, Inc. before his employment with THG-NY (or its predecessor) and developed that relationship using THG-NY's (or its predecessor's) resources and goodwill.

92.     Indeed, Cardworks, Inc. was the largest customer Ring serviced and supported for THG-NY.  It generated more than $600,000.00 in annual revenue for THG-NY and substantial commissions for Ring.

93.     Cardworks, Inc. is headquartered in Woodbury, New York.

94.     Upon information and belief, Ring solicited Cardworks, Inc. to move its policies from THG-NY to Associated while still employed by THG-NY.

95.     In soliciting Cardworks, Inc. to move its business to Associated, Ring communicated with Cardworks' key decision makers located in New York.

96.     Upon information and belief, Ring wanted to make sure that, even if THG-NY declined to sell the book of business to Associated, he could move Cardworks, Inc.'s accounts to THG-NY regardless of his contractual and other legal obligations to THG-NY.

97.     Upon information and belief, Ring drafted the letter attached as Exhibit 5 before his resignation from THG-NY but dated it for June 21, 2022—the day of his resignation.

98.     Upon information and belief, Ring instructed Cardworks, Inc. to wait until after his resignation from THG-NY to send the letter to Cincinnati Insurance Company.

99.     Upon information and belief, Associated was aware of, and encouraged and directed, Ring's illegal activities, including by its receipt, analysis and use of THG-NY's Confidential Information about such accounts to negotiate with, recruit and ultimately hire Ring.

100.    On July 5, 2022, THG-NY received notice that Cardworks, Inc. was moving additional insurance policies to Associated, including its policies for (1) Financial Institution Bond; (2) Fiduciary Liability/Special Crime Coverage; (3) General Partners Liability/ Directors and Officers Liability/Employment Practices Liability; and (4) Network Security & Privacy

Liability.  In all, Cardworks, Inc. had moved seventeen policies to Associated—because of Ring's unlawful solicitations.

101.    The annual revenue of the accounts THG-NY has lost to Associated because of Ring's unlawful actions is considerable and, due to the nature of the insurance brokerage business, may lead to future losses.

102.    Neither Ring nor Associated has provided a substantive response to THG-NY's June 30, 2022 letter.

103.    Ring never intended to abide by, and has not abided by, his restrictive covenant and other legal obligations to THG-NY.

104.    Indeed, Ring even called one of his former THG-NY co-workers and told the co-worker that Ring would continue to solicit THG-NY's customers until he successfully moved the entire book of business Ring serviced for THG-NY to Associated.

105.    Ring's actions demonstrate that he has no intention of complying with his restrictive covenant and other legal obligations to THG-NY in the future.

106.    Associated instructed, directed, and encouraged Ring to violate his restrictive covenant and other legal obligations to THG-NY.

107.    Associated's actions demonstrate that it has no intention of ensuring Ring's compliance with his contractual and other legal obligations to THG-NY and that it intends to continue tortiously interfering with the Restrictive Covenant Agreement.

108.    Ring has had contact with and/or solicited, and continues to have contact with and/or solicit, other THG-NY customers to provide insurance products or services on behalf of Associated or its affiliates.

17

109.   Ring has been selling and/or providing, and continues to sell or provide, "Competitive Products and Services" to THG-NY "Customers," including to Cardworks, Inc. and Robyn Morgenstern and Szymon Rosenblatt, on behalf of Associated or its affiliates.

110.   Ring has intentionally induced, and continues to intentionally induce, THG-NY "Customers," including Cardworks, Inc. and Robyn Morgenstern and Szymon Rosenblatt, to reduce, terminate, or decline to renew their business with THG-NY.

111.   Upon information and belief, Associated has continued to instruct, direct, and encourage Ring to have contact with and/or solicit other THG-NY customers to provide insurance products or services to them on behalf of Associated or its affiliates regardless of his restrictive covenant obligations, and has necessarily used THG-NY Confidential Information about those accounts in doing so.

112.   Upon information and belief, Associated has continued to instruct, direct, and encourage Ring to sell and/or provide "Competitive Products and Services" to THG-NY "Customers" on behalf of Associated or its affiliates regardless of his restrictive covenant obligations.

113.   Upon information and belief, Associated has continued to instruct, direct, and encourage Ring to intentionally induce THG-NY "Customers" to reduce, terminate, or decline to renew their business with THG-NY regardless of his restrictive covenant obligations.

114.   THG-NY and its employees have been and continue to be irreparably harmed by Defendants' actions.

115.   When a departing producer, like Ring, goes to work for a competitor and takes a customer with him, the resulting losses are difficult to measure.  This is due in part to the loss of that customer's future renewals and referrals and because the specific value of any given customer

in the insurance field is subject to a multitude of variable factors, such as the specific policies at issue and commission rates.

116.     Given this difficulty in valuing losses, there is tremendous value to protecting THG-NY's customer base from further unlawful competition by Defendants, as the resulting damage cannot be undone.

117.     If Ring is not prevented from continuing to solicit and provide Competitive Products and Services to THG-NY's customers and otherwise violate his contractual and other legal obligations for Associated's benefit, THG-NY will continue to lose the customers previously serviced by Ring at THG-NY and possibly other customers.  The resulting harm will not be reversible or easy to quantify.

118.     Ring's continued refusal to abide by his restrictive covenant and other legal obligations, and Associated's continued interference with those obligations, demonstrate that Defendants plan to damage THG-NY's business interests even further.

## COUNT I
**(Breach of the Restrictive Covenant Agreement – Against Ring)**

119.     THG-NY incorporates by reference Paragraphs 1 through 118 of this Complaint.

120.     The Restrictive Covenant Agreement attached hereto as Exhibit 1 is a valid, binding, and enforceable contract between THG-NY and Ring.

121.     THG-NY and Ring exchanged adequate and sufficient consideration in connection with the Restrictive Covenant Agreement.

122.     The restrictions on performing activities or services which would present a conflict of interest with Ring's employment with THG-NY set forth on page 1 of the Restrictive Covenant Agreement and described in Paragraph 39 above are valid, binding, and enforceable.

19

123.     The restrictions on solicitation set forth on page 9 of the Restrictive Covenant Agreement and described in Paragraph 45 above are valid, binding, and enforceable.

124.     The restraints imposed by such restrictions are no greater than necessary to protect THG-NY's legitimate business interests.

125.     The restrictions contained in the Restrictive Covenant Agreement are not unreasonably harsh or oppressive in curtailing Ring's legitimate efforts to earn a livelihood.

126.     The restraints imposed by such restrictions are reasonable from the standpoint of public policy and are consistent with industry standards.

127.     The temporal limitations set forth in the Restrictive Covenant Agreement are reasonable considering Ring's duties and responsibilities for THG-NY and the competitive nature of THG-NY's business.

128.     Ring's conduct described herein, including, but not necessarily limited to, soliciting THG-NY's customers on behalf of Associated, both during and after his employment with THG-NY, constitutes a breach of his obligations under the Restrictive Covenant Agreement.

129.     Because of Ring's unlawful conduct, THG-NY has suffered and/or will continue to suffer irreparable harm or loss, and has suffered and will continue to suffer financial and economic loss.

130.     Ring's breach of the Restrictive Covenant Agreement has proximately caused financial harm to THG-NY in an amount to be proven at trial.  Such amount, however, is more than $75,000.00, which represents the damages from lost business and the value of an injunction protecting THG-NY from Ring's unfair competition.

## COUNT II
### (Breach of Duty of Loyalty Against Ring)

131.     THG-NY incorporates by reference Paragraphs 1 through 118 of this Complaint.

132.    Ring had a common law duty of loyalty to THG-NY not to actively use his position for his own personal benefit, or for the benefit of another company, and/or to hinder THG-NY's ability to succeed in its business operations.

133.    Ring specifically acknowledged his duty of loyalty to THG-NY in the Restrictive Covenant Agreement.

134.    Ring, through his client-facing position with THG-NY, formed relationships with THG-NY's customers and took advantage of THG-NY's goodwill in the industry.

135.    During his employment with THG-NY, Ring breached his duty of loyalty to THG-NY by using the relationships with THG-NY's customers as a THG-NY employee to induce those customers, including Cardworks, Inc. and Robyn Morgenstern and Szymon Rosenblatt, to move their business from THG-NY to Associated.

136.    By diverting business opportunities and client accounts in anticipation of his planned departure, Ring breached his duty of loyalty to THG-NY.

137.    By breaching his duty of loyalty to THG-NY, Ring acted with malice, wantonness, bad faith, and with the specific intent to cause harm to THG-NY.  Accordingly, to punish Ring and to deter him from engaging in such misconduct, THG-NY is entitled to punitive damages in an amount to be determined at trial.

138.    As a proximate result of Ring's actions, THG-NY has suffered and will continue to suffer financial and economic loss.

## <u>COUNT III</u>
**(Tortious Interference with Contractual Relations against Associated)**

139.    THG-NY incorporates by reference Paragraphs 1 through 118 of this Complaint.

140.    The Restrictive Covenant Agreement attached as Exhibit 1 is a valid, binding, and enforceable contract between THG-NY and Ring.

141.    Associated knew or reasonably should have known that Ring was bound by the Restrictive Covenant Agreement because Ring notified Associated of the agreement during Associated's recruitment process, and before Ring accepted employment with Associated.

142.    Associated knew that Ring's solicitations of THG-NY's "Customers" would constitute a breach of Ring's restrictive covenant obligations to THG-NY.

143.    Associated knew that Ring's disclosure of THG-NY's Confidential Information, and his sales and provision of "Competitive Products and Services" to THG-NY's "Customers" would constitute a breach of Ring's restrictive covenant obligations to THG-NY.

144.    Upon information and belief, Associated instructed Ring to disregard his restrictive covenant obligations to THG-NY.

145.    Upon information and belief, Associated offered to provide counsel, pay for legal fees or otherwise defend Ring if a dispute developed regarding Ring's restrictive covenant obligations to THG-NY.

146.    Associated, through its conduct, intentionally procured Ring's breach of the Restrictive Covenant Agreement without justification.

147.    Ring would not have breached his restrictive covenant obligations to THG-NY but for Associated's conduct, including Associated's assurances that it would purchase the customer accounts Ring serviced for THG-NY and its offer to pay for legal fees.

148.    Associated's conduct evinces improper motive and a use of improper means to interfere with THG-NY's contractual relations with Ring.  This interference was, and is, without lawful justification or legitimate reason.

149.    In interfering with Ring's restrictive covenant obligations to THG-NY, Associated acted with the express purpose to damage THG-NY's business interests.

150.    As a direct and proximate result of Associated's tortious interference with the Restrictive Covenant Agreement, THG-NY has suffered damages in an amount to be proven at trial.  Such amount, however, is more than $75,000.00, which represents the damages from lost business and the value of an injunction protecting THG-NY from Associated's unfair competition.

**COUNT IV**
**(Aiding and Abetting Breach of Duty of Loyalty against Associated)**

151.    THG-NY incorporates by reference Paragraphs 1 through 118 of this Complaint.

152.    Ring's conduct described in this Complaint, including, but not limited to, soliciting THG-NY's customers to move their business to Associated while still employed by THG-NY violated his duty of loyalty to THG-NY.

153.    By its conduct described in this Complaint, including, but not limited to, instructing, directing, and encouraging Ring to solicit THG-NY's customers on Associated's behalf before his resignation, Associated knowingly induced and/or participated in Ring's breach of his duty of loyalty to THG-NY.

154.    As a direct and proximate result of Associated's unlawful actions, THG-NY has suffered and will continue to suffer financial and economic loss.

**REQUEST FOR INJUNCTIVE RELIEF**

155.    THG-NY incorporates by reference Paragraphs 1 through 154 of this Complaint.

156.    By virtue of the allegations in this Complaint, THG-NY has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Defendants.

157.    Unless Defendants are permanently enjoined from engaging in any additional misconduct, THG-NY will be irreparably harmed in the marketplace by the loss of customers and customer goodwill and by damage to its reputation in the insurance brokerage marketplace.

158.    Such misconduct would result in substantial loss which is unascertainable at this point in time, and future economic loss which is presently incalculable, but which exceeds $75,000.00.

159.    The threatened injury to THG-NY, an organization whose value—and related ability to employ thousands of individuals—is tied in with preserving the sanctity of its customer relationships and goodwill, far outweighs the potential harm to Defendants who can ply their respective trades in ways that do not violate or interfere with the Restrictive Covenant Agreement.

160.    Enforcing legal and valid contracts and preventing unfair competition is always in the public interest.  Ring agreed to abide by his restrictive covenant obligations to THG-NY.  As such, the entry of injunction to enforce these legal and valid agreements would be consistent with—and not adverse to—the public interest.

161.    Unless Defendants are preliminarily enjoined from engaging in any additional misconduct, THG-NY will be irreparably harmed in the marketplace by the loss of customers and customer goodwill and by damage to its reputation in the insurance brokerage and risk management marketplace.

162.    THG-NY has no adequate remedy at law for Defendants' misconduct, and Ring has contractually agreed in his Restrictive Covenant Agreement with THG-NY that THG-NY shall be entitled to injunctive relief to enforce the restrictions in the agreement, with such relief specifically including a temporary and/or permanent injunction, along with such other equitable relief as may be appropriate under the circumstances.

24

## PRAYER FOR RELIEF

WHEREFORE, THG-NY respectfully requests the following:

A.      Injunctive relief against Ring, and all those acting in concert with him, requiring him to comply with his obligations under the Restrictive Covenant Agreement;

B.      An order for specific performance requiring Ring to comply with his obligations under the Restrictive Covenant Agreement in accordance with its terms;

C.      Injunctive relief against Associated, all those acting in concert with it, requiring Associated to cease interfering with THG-NY's contractual relations with Ring;

D.      An order tolling the restricted period under the Restrictive Covenant Agreement and computing such restricted period "from the earlier of (a) the date [Ring] resumes compliance with the covenant, or (b) the date [THG-NY] is granted injunctive relief by a court of competent jurisdiction enforcing the covenant, reduced by the number of days [Ring] was not in violation of the covenant." Ex. 1, p. 10 at ¶ 9;

E.      An order requiring Defendants, and anyone acting in concert with them, to preserve and not destroy or alter in any manner all documents or other information in their possession, custody or control (including, but not limited to, notes, calendar entries, invoices, e-mails, text messages, voice messages, and phone records) that may be relevant or discoverable in this litigation, including, but not limited to, all records and any other evidence of Ring's communications with any "Customer" as that term is defined in the Restrictive Covenant Agreement;

F.      An accounting of all income earned or derived from any business activity with any "Customer" as that term is defined in the Restrictive Covenant Agreement or from any business activity which violates the Restrictive Covenant Agreement;

G.       An order permitting THG-NY to take expedited discovery to determine the scope and nature of Defendants' unlawful conduct as alleged in this Complaint;

H.       Actual damages against Ring in excess of $75,000.00 Dollars, in an amount to be determined at trial;

I.       Punitive damages in an amount to be determined at trial;

J.       Attorneys' fees and costs;

K.       Interest; and

L.       Any other relief the Court deems appropriate.

This 14th day of July, 2022.                     Respectfully submitted,

                                                 **THE HILB GROUP OF NEW YORK, LLC**


                                                 By:     */s/ Michael L. Simes*_____
                                                         Michael L. Simes
                                                         1251 Avenue of the Americas, 20th Floor
                                                         New York, New York 10020-1104
                                                         Telephone: (212) 548-7013
                                                         Facsimile: (212) 715-6210
                                                         msimes@mcguirewoods.com

                                                         Rodney A. Satterwhite (VSB #32907)
                                                         To request admission *pro hac vice*
                                                         Igor M. Babichenko (VSB #78255)
                                                         To request admission *pro hac vice*
                                                         McGuireWoods LLP
                                                         Gateway Plaza
                                                         800 East Canal Street
                                                         Richmond, Virginia 23219
                                                         (804) 775-1000
                                                         (804) 775-1061 (Facsimile)
                                                         rsatterwhite@mcguirewoods.com
                                                         ibabichenko@mcguirewoods.com

## VERIFICATION

**State of New York**    )
                         )
**City/County of** NASSAU    )

The undersigned authorized representative of The Hilb Group of New York, LLC ("Plaintiff"), being duly sworn on his oath, does hereby state that he has read the foregoing Verified Complaint, and that the statements set forth in the Verified Complaint are true as he believes based on his personal knowledge and information supplied by Plaintiff's employees and agents and through records kept by Plaintiff in the ordinary course of business.

This 13TH day of July, 2022.

By: _____
                    Gary Morris

Notary: _____

VICTOR HOROWITZ
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HO4643820
Qualified in Nassau County
Commission Expires April 30, 2023