# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

––––––––––––––––––––––

№ 22-CV-04131 (RER) (ST)

––––––––––––––––––––––

## THE HILB GROUP OF NEW YORK, LLC

VERSUS

## ASSOCIATED AGENCIES, INC AND GREGORY RING

––––––––––––––––––

**MEMORANDUM & ORDER**

––––––––––––––––––

**RAMÓN E. REYES, JR., District Judge:**

The Hilb Group of New York, LLC ("Plaintiff" or "THG-NY") brings this action against defendants Associated Agencies Inc. ("Associated") and Gregory Ring ("Ring") (collectively "Defendants") alleging New York common law claims of breach of contract; breach of the duty of loyalty; aiding and abetting breach of the duty of loyalty; and tortious interference with contract; as well as misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and New York common law. THG-NY's claims stem from the actions of its former producer, Ring, who left THG-NY to work for Associated and allegedly took and shared client information, and solicited and serviced THG-NY clients, in violation of two confidentiality, non-solicitation, and non-servicing agreements that Ring signed when working for THG-NY.

Plaintiff now moves for summary judgment as to liability on all claims. Defendants oppose and cross-move for summary judgment on all claims.

After carefully reviewing the record, and for the reasons set forth herein, the cross-motions for summary judgment are granted in part and denied in part. THG-NY's motion

is granted with respect to Counts I and II (breach of contract), and III (breach of duty of loyalty). Defendants' motion is granted with respect to Counts IV (tortious interference) and V (aiding and abetting). The motions are denied in all other respects.

## BACKGROUND

I.    Factual Background

The following facts are taken from the parties' Rule 56.1 statements and relevant portions of the record and are undisputed unless otherwise noted.

In September 2015, Ring, an independent contractor, began working as a Producer at Rampart Brokerage Corporation ("Rampart"), an insurance and employee benefits brokerage. (ECF No. 143-1 ("Defs.' Resp. to Pl.'s 56.1") ¶¶ 6–8).

On December 1, 2020, THG-NY, another insurance and employee benefits brokerage, purchased "substantially all" of Rampart's assets. (*Id.* ¶¶ 18–22). Rampart and THG-NY entered into an Asset Purchase Agreement ("APA") (ECF No. 146-24 (the "APA")), in which Rampart "sold, conveyed, transferred, and irrevocably assigned and delivered" the "Acquired Assets"[1] to the THG-NY, (Defs.' Resp. to Pl.'s 56.1 ¶¶ 21–23). In connection with the APA, "Rampart purchased the fifty percent interest that each of its independent contractor Producers had in Rampart's Client Accounts." (*Id.* ¶ 26). Thereafter, Rampart ceased operation, and THG-NY began doing business as "Rampart Insurance Services." (*Id.* ¶ 25).

---

[1] "Acquired Assets" is defined in the APA as "all the assets, properties, and rights owned by any Seller and used in the operation of the Company Business." (APA at 41–43).

On the same day, December 1, 2020, Rampart, Ring, RINGS5,[2] and THG-NY entered into an Account Acquisition Agreement (the "AAA"). (*Id.* ¶ 27; ECF No. 141-34 (the "AAA")). Prior to entering into the AAA, Ring consulted with his attorney. (Defs.' Resp. to Pl.'s 56.1 ¶ 29). Under the AAA, Rampart purchased Ring's "right, title and interests" in and "Goodwill associated with" the clients listed in the "Acquired Accounts" for $165,914.10. (*Id.* ¶¶ 35, 41; AAA at 2). Rampart's rights were assigned to THG-NY on the same day via the APA. (Defs.' Resp. to Pl.'s 56.1 ¶ 46). The "Acquired Accounts" are: (1) Burton and Linda Ruder; (2) Cardworks Acquiring, LLC and Cardholder Management Services ("Cardworks"); (3) Jordan and Jodi Perlmutter; (4) Lawrence and Diane Ruder; (5) Michael and Erica Ruder; (6) Pivot Media Ventures, LLC ("Pivot Media"); and (7) Stanley and Ricki Ring. (*Id.* ¶ 36). Additionally, under Article 7 of the AAA, Ring agreed to abide by specified restrictive covenants. (*Id.* ¶¶ 37–38). Article 7 includes a non-solicitation and non-servicing agreement, to terminate in three years, on December 1, 2023, and a confidentiality agreement with no expiration date. (*Id.* ¶ 38). Article 7.1(a) of the AAA states: "[Ring] will not, directly or through another under [Ring's] supervision or control, use, or willfully disclose to any Person, any Confidential Information or Trade Secrets of [Ring] or [Rampart]." (AAA at 9). "Confidential Information" is defined in the AAA as, *inter alia*:

> [A]ny information of a Person, that is not already generally available to the public . . . all of which the Parties agree shall be deemed to be Trade Secrets under governing trade secrets law, including but not limited to . . . the identity of any Client included as an Acquired Account, as well as the identity of any

---

[2] "RINGS5, LLC is New York Limited Liability company belonging to Gregory Ring for purposes of working as an independent contractor for Rampart." (Defs.' Resp. to Pl.'s 56.1 ¶ 28).

active prospective client as of such date; . . . the types of insurance coverages . . . provided or to be provided specifically to any such Client or active prospective client, and the internal corporate policies relating thereto; . . . the specific insurance policies purchased by or for such Clients or active prospective clients; . . . [and] the expiration dates, commission rates, fees, premiums, and other terms and conditions of such policies.

(*Id.* at 12). "Client" is defined in the AAA as

any Person . . . to whom or which [Ring] has provided, at any time within the twenty-four (24) months preceding the Closing Date,[3] any services that [Ring] provides in the context of Business.

(*Id.*) Article 7.1(b) of the AAA states:

Except as an agent of [Rampart] and on behalf of [Rampart] as an independent contractor or employee, [Ring] will not, directly or through another under [Ring's] supervision or control, (i) solicit the provision of any Business from; (ii) provide or accept any request to provide any Business to; (iii) accept a broker of record letter[4] with respect to; or (iv) otherwise induce the termination or non-renewal of any Business to, any Client included in the Acquired Accounts or any Client of [Rampart] or any other Affiliate of [Rampart], with whom [Ring] had contact during his or her employment with [Ring] or as an independent contractor or employee of [Rampart], or with whom he or she became familiar as a result of such relationships.

(*Id.* at 9). Rampart's rights, under the AAA, were assigned to THG-NY via the APA. (Defs.' Resp. to Pl.'s 56.1 ¶ 46).

On the same day, December 1, 2020, Ring entered into a Producer Employment Agreement ("PEA") (ECF 141-35 (the "PEA")), with THG-NY to work as a Producer (an at-will employee, not an independent contractor). (Defs.' Resp. to Pl.'s 56.1 ¶ 48). Under

---

[3] The "Closing Date" was December 1, 2020 (AAA at 2), making the twenty-four months preceding the Closing Date December 1, 2018, until December 1, 2020.

[4] "A 'broker of record' letter is a letter that is signed by an insured client and sent to an insurance carrier, indicating that the client wants to change its insurance broker." *In re Marklin*, No. 8-21-71030 (REG), 2023 WL 6306786, at *3 n.6 (Bankr. E.D.N.Y. Sept. 27, 2023).

the PEA, Ring agreed to a duty of loyalty owed to THG-NY during his employment. (*Id.* ¶ 57). Further, Ring agreed to THG-NY's Confidentiality and Non-Solicitation Agreement, or "CNSA" (PEA at 10–17). (Defs.' Resp. to Pl.'s 56.1 ¶¶ 58–59). As to confidentiality, the CNSA states:

> During the time [Ring] is employed by [THG-NY] and for a period of ten (10) years following the date [Ring's] employment with [THG-NY] ends for any reason . . . [Ring] shall not (except as expressly authorized in writing by [THG-NY][]) . . . disclose any Confidential Information to any person or entity other than [THG-NY] or another one of the Hilb Companies, unless and until such Confidential Information has become public knowledge without fault by [Ring] or any other individual with confidentiality obligations to [THG-NY] or another one of the Hilb Companies.

(PEA at 11). The CNSA states:

> Confidential Information may include trade secrets, customer pricing, rates, customer lists, customer leads, supplier pricing, employee compensation arrangements, business practices, plans, policies, secret inventions, processes and compilations of information, drawings and designs, records and specifications, as well as information related to the development of products, costs, management policies, and plans for [THG-NY].

(*Id.*). Further,

> [a]ll written or other tangible material containing Confidential Information shall not be removed from the premises of [THG-NY], either in original or reproduced form, under any circumstances whatsoever, without the prior written consent of the Chief Executive Officer of [THG-NY], except in the ordinary course of business, and shall be immediately delivered to [THG-NY] upon the earlier of a request by [THG-NY] or the termination of [Ring's] employment with THG-NY.

(*Id.*).

> As to non-solicitation, the CNSA states:

> [D]uring [Ring's] employment with [THG-NY] and for a period of two (2) years immediately following the termination of [Ring's] employment for any reason, [Ring] shall not directly or indirectly, on behalf of [Ring] or on behalf of any other individual or entity:

A. contact, solicit, or assist in the solicitation of any of [THG-NY's] Customers . . . for the purpose of selling or providing any Competitive Products or Services . . . ;
B. sell or provide any Competitive Products or Services . . . to any of [THG-NY's] Customers . . . ; or
C. intentionally induce or attempt to induce any of the [THG-NY's] Customers to cease doing business in whole or in part with [THG-NY].

(*Id.* at 12). "Customer" is defined as "any individual or entity that is a customer of [THG-NY]: (i) with whom [Ring] had any contact, communication, or for whom [Ring] had supervisory, sales, or service responsibility within the last twenty-four (24) months of [Ring's] employment with [THG-NY]; or (ii) about whom [Ring] learned Confidential Information." (*Id.*)

Ring provided services during the twenty-four months preceding the AAA (December 1, 2018, until December 1, 2020) to the following Rampart clients: (1) Burton and Linda Ruder; (2) Cardworks; (3) Daniel and Alexis[5] Siegel; (4) Jordan and Jodi Perlmutter; (5) Lawrence and Diane Ruder; (6) Michael and Erica Ruder; (7) Pivot Media; and (8) Stanley and Ricki Ring; and Gregory Ring and Dana Ruder. (Defs.' Resp. to Pl.'s 56.1 ¶ 39).

Ring had contact or communication with, and brokered or renewed insurance policies, between December 1, 2020 and June 21, 2022, for the following THG-NY clients: (1) Burton and Linda Ruder; (2) Cardworks; (3) Daniel and Alexis Siegel; (4) Jordan and Jodi Perlmutter; (5) Lawrence and Diane Ruder; (6) Michael and Erica Ruder; (7) Pivot Media; (8) Stanley and Ricki Ring; (9) Josh Mangel and Alexandra Rowe; (10) Robyn

---

[5] The Court notes that some places in the record refer to "Alexis Siegel" and others refer to "Alix Siegel." The Court assumes this references the same person and will refer to them as "Alexis" throughout this opinion.

6

Morgenstern and Syzmon Rosenblatt; (11) Russell and Elizabeth Mollen; and (12) Victor Morgenstern. (*Id.* ¶ 68).

On June 8, 2022, Associated, which "provides a variety of businesses and individuals with insurance brokerage and risk management services," sent Ring an offer letter to join Associated as a Producer. (*Id.* ¶¶ 78–79, 95–96). Skip Schrayer is Associated's CEO and Josh Herz is Associated's President. (*Id.* ¶ 85). Ring expressed concerns to Schrayer that he was nervous THG-NY would sue him, and Associated told Ring they would protect and indemnify him against any litigation by THG-NY. (*Id.* ¶ 100). On June 14, 2022, Associated sent Ring a revised offer letter, which included the following language: "In the event you get sued by your prior employer due to accepting business at Associated Agencies, we will indemnify you and hold you harmless and work with you to settle any lawsuits that arise." (*Id.* ¶ 101).

That same day, on June 14, 2022, Ring took photos of "compiled account information" on THG-NY's Salesforce system (the "Salesforce Photos") (ECF No. 146-27), using his phone. (Defs.' Resp. to Pl.'s 56.1 ¶ 103). The photos included policy numbers, client codes, and coverage codes for new policies written in 2022 for fourteen of Ring's clients. (*Id.* ¶ 103). Further, the photos included additional information for three of those fourteen accounts—(1) Cardworks; (2) Victor Morgenstern; and (3) Robyn Morgenstern and Szymon Rosenblatt—which included each account's policy number, effective date, expiration date, written premium, Ring's individual commission, the type of insurance, and the carrier's name. (*Id.* ¶ 103). As will be relevant, Plaintiff and Defendants dispute the level of security in place at THG-NY to protect this information. Plaintiff states, with support from deposition testimony and THG-NY policy documents, that it protects

the confidentiality of compiled account information through limiting view of the information to certain employees, disabling the ability to print, password-protecting Salesforce, requiring employees to enter into confidentiality and nondisclosure agreements as a condition of employment, and implementing security protocols regarding passwords. (*Id.* ¶ 76). Defendants dispute whether Plaintiff abides by these asserted security measures because in 2019, Gary Morris, Rampart's CEO, emailed compiled account information to the personal email accounts of each Producer, including Ring. (*Id.* ¶ 15, 76; ECF No. 143-4 ("Gary Morris Dep.") at 56:21–63:16).

Also on June 14, 2022, Ring told Chris Wymbs, a Cardworks representative, that he would be resigning from THG-NY. (Defs.' Resp. to Pl.'s 56.1 ¶ 105). On June 16, 2022, Wymbs emailed Ring's Rampart email asking, "Can I mention your planned move to anyone internally or not yet?" (*Id.* ¶ 107). On June 17, 2022, Ring texted Wymbs stating that he preferred text as opposed to email communication, asking Wymbs not to mention Ring's move "until i resign," and stating Ring would "call [Wymbs] when done." (*Id.* ¶ 108).

On June 20, 2022, Ring forwarded an email he had previously sent to PLNewBusiness@rampartinsurance.com, the email address where Rampart and THG-NY producers sent new business to be quoted, to his personal email. (*Id.* ¶ 109).

On June 20, 2022, Ring executed the revised offer letter from Associated. (*Id.* ¶ 110). Ring resigned from THG-NY the following day—on June 21, 2022. (*Id.* ¶ 117). Gary Morris reminded Ring that he had an agreement with THG-NY, and that THG-NY was not likely to be interested in selling Ring's book of business. (*Id.* ¶ 118). Ring began working at Associated on June 22, 2022. (*Id.* ¶ 122).

Several things occurred during Ring's first week or so at Associated. Associated and THG-NY discussed buying/selling Ring's book of business, which THG-NY ultimately declined to sell to Associated. (*Id.* ¶¶ 128, 130, 142, 146). Associated sent broker of record letters to Cardworks to execute for several policies, and Ring informed Jordan Perlmutter (owner of Pivot Media) and Russell Mollen that he left THG-NY. (*Id.* ¶¶ 126–27, 129). Ring texted Robyn Morgenstern, stating that he heard she had learned of his move to Associated and that "[n]othing will change of course with your policy." (*Id.* ¶ 131). Ring emailed Victor Morgenstern and Faye Morgenstern informing them that he began new employment at Associated, attaching a broker of letter record to be signed, and stating: "I am retaining all my clients throughout the country, and I hope that you will come with me as well. Please sign the attached [broker of record] letters and email back to me. If you prefer, I can print them out and swing by the house and have you sign." (*Id.* ¶ 138). Ring emailed Robyn Morgenstern and Syzmon Rosenblatt stating that he knew they were aware he now worked at Associated, attaching a broker of record letter, and stating "[p]lease sign the attached [broker of record] letter so that we can transfer the insurance to Associated Agencies. Absolutely nothing will change with respect to the coverage, etc." (*Id.* ¶ 139). Ring called and emailed Josh and Alexandra Mangel informing them he changed brokerages and asking them to execute a broker of record letter, which they did. (*Id.* ¶ 140). In their communications, Ring stated: "[n]othing changes regarding your insurance" and that his old brokerage and new brokerage were "negotiating now." (*Id.*) Ring emailed Burt Ruder informing him of his new position and asking for Ruder's policy information to "prepare the paperwork and transfer the policies over to me." (*Id.* ¶ 141). Ring emailed a broker of record letter for Cardworks to Diane Seno, an Associated

9

employee, instructing her to send it in unless she heard otherwise from Josh [Herz] or Skip [Schrayer]. (*Id.* ¶ 144). He also asked Stephanie Undesser, an Associated employee, to send in broker of record letters for Josh and Alexandra Mangel, and Victor and Faye Morgenstern. (*Id.* ¶ 148). During his deposition, Ring was asked where he got the customer names, policy numbers, and insurance carriers to prepare the broker of record letters at Associated, to which he answered, "From the pictures I took on Salesforce." (ECF No. 141-33 ("Ring Dep.") at 169:14–171:8).[6]

## II.    Procedural History

On July 14, 2022, Plaintiff commenced this action against Defendants. (ECF No. 1 ("Compl.")). Plaintiff moved for a temporary restraining order ("TRO") (ECF No. 3), which the Court granted on July 18, 2022, (ECF No. 9 ("TRO")). The Court then issued an amended TRO on July 26, 2022, ordering that Ring was temporarily restrained or enjoined from directly or indirectly, on behalf of himself or on behalf of any other individual or entity (1) "contacting, soliciting, or assisting in the solicitation of any Customers of THG-NY in violation of the Restrictive Covenant Agreement;" (2) "selling or providing any Competitive Products or Services to any Customers of THG-NY in violation of the Restrictive Covenant Agreement;" and (3) "intentionally inducing or attempting to induce any of Customers of THG-NY to cease doing business in whole or in part with THG-NY in violation of the Restrictive Covenant Agreement." (ECF No. 18 ("Am. TRO") at 1–2). Further, Ring was temporarily restrained and enjoined "from otherwise violating his

---

[6] The parties agree that the court reporter at Ring's deposition incorrectly paginated the deposition transcript. Therefore, the Court cites to the pagination added by Plaintiff's counsel (which is purple in the top right corner of the document).

restrictive covenant obligations under the Restrictive Covenant Agreement" and "from interfering with Ring's restrictive covenant obligations under the Restrictive Covenant Agreement." (*Id.* at 2). But, the amended TRO included the following language:

> [N]othing in this Order shall prevent or restrict (i) Associated from contacting or servicing any Customer of THG-NY who signed a Broker of Record letter requesting that Associated be recognized as his, her, or its broker of record prior to the entry of the July 18, 2022 Temporary Restraining Order (ECF No. 9), or (ii) Associated and/or Ring's attorneys from contacting any Customer of THG-NY for purposes of preparing Associated and/or Ring's defense in this action; or (iii) Ring from contacting or servicing the account of Cardworks, Inc. ("Cardworks") for the limited purpose of assisting Cardworks in procuring new workers' compensation and property insurance policies by July 31, 2022.

(*Id.* at 2–3).

On September 13, 2022, the Court entered a consensual two-year injunction. (ECF No. 30). The injunction restricted Ring from "[c]ontacting, soliciting, or assisting in the solicitation of any of THG-NY's Customers . . . for the purpose of selling or providing Competitive Products or Services;" "[s]elling or providing any Competitive Products or Services to any of THG-NY's Customers;" "[i]ntentionally inducing or attempting to induce any of THG-NY's Customers to cease doing business in whole or in part with THG-NY;" or "[o]therwise violating his restrictive covenant obligations under the Restrictive Covenant Agreement." (*Id.* at 1–2). However, the order permitted Ring to service, renew, extend, expand, modify, adjust, or obtain a replacement for "any existing insurance policies purchased or maintained" by himself or the following immediate family members: Ricki and Stan Ring, Diane and Lawrence Ruder, Alexis and Daniel Siegel, Michael and Erica Ruder, Burton and Linda Ruder, and Stephen and Melissa Price. (*Id.* at 2). It also permitted him to do the same for the following customers: Cardworks, Josh Mangel, Alexandra Rowe, Robyn Morgenstern, Victor Morgenstern, Rusell Mollen, and Elizabeth

11

Mollen. (*Id.* at 3). Ten days later, Ring began servicing Jordan and Jodi Perlmutter with a new insurance policy, in violation of the injunction. (Defs.' Resp. to Pl.'s 56.1 ¶ 153). Plaintiff moved for contempt and sanctions for violation of the injunction. (ECF No. 102). This Court granted Plaintiff's motion and ordered Associated to remit to Plaintiff the $2,437.55 in commissions Ring received on the Perlmutter policies and any additional commissions obtained on those policies through the life of the injunction. (ECF Nos. 111, 113). This Court later extended the injunction through December 31, 2024. (ECF No. 111).[7]

Plaintiff's second amended complaint became the operative complaint. (ECF No. 80 ("Second Am. Compl.")).

Following discovery, Plaintiff now moves for summary judgment. (ECF No. 141 ("Pl.'s Mem.")). Plaintiff argues that the Court should grant summary judgment on all its claims and proceed to a bench trial solely on the issue of damages. (*Id.* at 30). Defendants oppose and cross-move for summary judgment in their favor. (ECF No. 143 ("Defs.' Mem.")). Each party submitted a reply brief. (ECF No. 144 ("Pl.'s Reply"); ECF No. 145 ("Defs.' Reply")).

## **LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute as to material fact exists if a reasonable jury could return a

---

[7] This case was reassigned to the undersigned on January 11, 2024.

verdict for the nonmoving party." *Animal Welfare Inst. v. Romero*, 718 F. Supp. 3d 252, 261 (E.D.N.Y. 2024) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." *Id.* (citation omitted).

"Once this burden is met, however, the burden shifts to the non-moving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial." *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *4 (E.D.N.Y. Apr. 2, 2020) (citing *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009)). To do so, the nonmoving party may not rely on "[a] mere 'scintilla of evidence'" but "'must come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (first quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003), then quoting *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002)); *see also Garcia v. Saigon Mkt. LLC*, No. 15 Civ. 9433 (VSB), 2019 WL 4640260, at *3 (S.D.N.Y. Sept. 24, 2019) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) ("To defeat a summary judgment motion, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'").

In deciding a summary judgment motion, courts must "construe the facts in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). Where the record as a whole "could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). "When both sides have moved for summary judgment,

13

the court must apply the above principles to each motion separately." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).

## DISCUSSION[8]

I.      Breach of Contract

Two contracts are at issue: the Account Acquisition Agreement ("AAA") and the Confidentiality and Non-Solicitation Agreement ("CNSA") (a provision within the Producer Employment Agreement ("PEA")). (*See* AAA, PEA). Plaintiff alleges that Ring breached the non-servicing, non-solicitation, and confidentiality provisions of each contract. Before determining whether Ring breached either or both contracts, the Court must determine whether the restrictive covenants are enforceable against Ring.

A. The Restrictive Covenants in the AAA and CNSA are Enforceable Against Ring

"To determine whether a post-employment covenant is specifically enforceable under New York law, courts have adopted the prevailing common law reasonableness standard." *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 187 (S.D.N.Y. 2011) (citing *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382 (1999)). "A restraint is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* "The violation of any prong renders the covenant invalid." *FTI Consulting,*

---

[8] In its papers, Plaintiff states that New York law applies. (Pl.'s Mem. at 14–15). While Defendants do not address choice of law, Defendants' opposition and cross-motion "assume[s] that New York law controls this dispute, and such implied consent . . . is sufficient to establish choice of law." *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 296 (2d Cir. 2000) (citation omitted).

*Inc. v. Graves*, No. 05 Civ. 6719 (NRB), 2007 WL 2192200, at *5 (S.D.N.Y. July 31, 2007). As to the first prong, "New York courts have recognized four legitimate interests that may be asserted to support a restrictive covenant: (1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Reed Elsevier Inc. v. Transunion Holding Co.*, No. 13 Civ. 8739 (PKC), 2014 WL 97317, at *8 (S.D.N.Y. Jan. 9, 2014).

Plaintiff argues that the restrictive covenants are necessary to protect THG-NY's legitimate interests in its confidential information, trade secrets, client information, and client relationships, because Plaintiff invested time and effort into Ring (who had no insurance industry experience or existing client account when he joined Rampart), paid him for his client accounts and goodwill, and paid him commission and employment benefits. (Pl.'s Mem. at 16–18). The Court finds that Plaintiff has a legitimate interest in protecting confidential client information and client relationships. *See John Hancock Mut. Life Ins. Co. v. Austin*, 916 F. Supp. 158, 164–65 (N.D.N.Y. 1996) (citing *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 308 (1976)) (holding that while lists containing *only* customer names do not constitute a trade secret or confidential customer information in the insurance field, papers containing "information involving customer coverage, premium accounts, cash values, and loans against existing policies . . . rises to the level of confidential customer information") (emphasis added).

Relying on *Borne Chem. Co. v. Dictrow*, 85 A.D.2d 646 (2d Dep't 1981), Defendants contend that THG-NY does not have a protectable interest under the AAA because that agreement was between Rampart and Ring, and Rampart is no longer

15

operating; therefore, "because Hilb stands in Rampart's shoes and cannot recover under the AAA any more than Rampart could recover, Hilb cannot prevail on its claims under that agreement." (Defs.' Mem. at 26–27). Plaintiff argues that *Borne Chemical Co.* is inapposite because, there, the court held that a trial court may award monetary damages for a proven violation of an employment contract, not that a restrictive covenant with an entity that ceases operation becomes unenforceable. (Pl.'s Reply at 14). Plaintiff argues further that the facts of *Borne Chemical Co.* and this case are distinguishable because, here, Rampart transferred its interest to THG-NY. (Pl.'s Reply at 15). The Court agrees. It is undisputed that, under the AAA, Rampart purchased Ring's clients listed in the "Acquired Accounts" and associated goodwill for $165,914.10, and that that Rampart's rights were assigned to THG-NY on the same day via the APA. (Defs.' Resp. to Pl.'s 56.1 ¶¶ 41, 46). Because, as Plaintiff argues, "there is still goodwill to be protected, even though Rampart ceased operating" (Pl.'s Reply at 15), the AAA is enforceable against Ring.

Defendants next contend that THG-NY does not have a protectable interest in clients who are Ring's friends and family members.[9] (Defs.' Mem. at 28–30). Plaintiff and Defendants disagree as to whether an employer has a legitimate interest in clients with whom an employee had a personal relationship prior to their employment. (*Id.*; Pl.'s Reply at 16–19). The Court agrees with Plaintiff. Of the cases cited by each party, no court has

---

[9] "In addition to Ring and his wife [Dana Ruder], these clients are: Burton and Linda Ruder, Cardworks, Daniel and [Alexis] Siegel, Jordan and Jodi Perlmutter, Josh Mangel and Alexandra Rowe, Lawrence and Diane Ruder, Michael and Erica Ruder, Pivot Media, Robyn Morgenstern and Szymon Rosenblatt, Russell and Elizabeth Mollen, Stanley and Ricki Ring and Victor and Faye Morgenstern." (Defs.' Mem. at 8 n.2).

16

held that an employer lacks a legitimate interest over *personal* relationships an employee had that pre-dated their employment and which the employer subsequently purchased from the employee. Rather, the case law supports the Plaintiff's position—that an employer has a legitimate interest in relationships financed and supported by the employer, especially when the employer has purchased the goodwill and relationships. *See Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 536 (S.D.N.Y. 2004)*.*

Even assuming, *arguendo*, that Plaintiff's interest in certain clients is undercut by Ring's pre-existing personal relationship with them before his employment, because the terms of the contracts are clear within the four corners, "there is no basis to look beyond the four corners of the contract at a party's subjective understanding or industry practice." *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 233 (S.D.N.Y. 2020) (citation omitted); *see PB Americas Inc. v. Cont'l Cas. Co.,* 690 F. Supp. 2d 242, 249 (S.D.N.Y. 2010) (citing *Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 199 (2001)) ("Courts will not examine extrinsic evidence to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face."). Based on the undisputed facts, Ring was represented by counsel when he agreed to the AAA. (Defs.' Resp. to Pl.'s 56.1 ¶ 29). Therefore, Ring cannot now argue that restricting him from taking his family and friends as clients when he left THG-NY is an unreasonable restriction. *See Express Freight Sys. Inc. v. YMB Enters. Inc.*, 623 F. Supp. 3d 39, 50–53 (E.D.N.Y. 2022).

Finally, Defendants contend that the CNSA's non-servicing provision is void as against public policy to the extent it purports to prevent Ring from accepting and servicing

17

clients that he did not solicit. (Defs.' Mem. at 30–32). This argument fails as a matter of law. Numerous courts have held non-servicing provisions prohibiting an employee from servicing former clients is valid if the restrictive covenant is "otherwise reasonable in scope." *Marsh USA Inc. v. Karasaki*, No. 08 Civ. 4195 (JGK), 2008 WL 4778239, at *18 (S.D.N.Y. Oct. 31, 2008) (collecting cases). The Court finds that the CSNA is "reasonable in scope." *Id.* Defendants have not argued, nor does the Court find, that the non-solicitation and non-servicing provisions impose undue hardship on Ring. Plaintiff correctly asserts that the restrictive covenants are reasonably limited both temporally and geographically, and "permit [Ring] to work and earn a living in his chosen field." (Pl.'s Mem. at 15–18). "Ring remains free to work anywhere in the world as an insurance producer—so long as he does not do it to the detriment of THG-NY's legitimate interests by soliciting or servicing THG-NY's clients." (Pl.'s Mem. at 18).

Therefore, the Court finds that the AAA and CNSA are enforceable against Ring. Having concluded that the restrictive covenants are enforceable, the Court now turns to whether Ring breached the confidentiality and non-solicitation and non-servicing provisions of the AAA and/or the CNSA.

B.  <u>Ring Breached the Confidentiality Provisions in the AAA and CNSA</u>

Under New York law, the elements of a breach of contract claim are a "contract, the plaintiff's performance under the contract, the defendant's breach, and damages resulting from the breach." *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 980 F. Supp. 2d 400, 408–09 (E.D.N.Y. 2013) (citation omitted).

The terms of the AAA and CNSA are undisputed. Article 7.1(a) of the AAA states: "[Ring] will not, directly or through another under [Ring's] supervision or control, use, or

18

willfully disclose to any Person, any Confidential Information or Trade Secrets of [Ring] or [Rampart]." (AAA at 9). The AAA defines "Confidential Information" to include information about a person that is "not already generally available to the public," the identity of clients in the "Acquired Accounts," the types of insurance coverages provided to and purchased for clients, and "the expiration dates, commission rates, fees, premiums, and other terms and conditions of such policies." (*Id.* at 12).

> As to confidentiality, the CNSA states:
>
> During the time [Ring] is employed by [THG-NY] and for a period of ten (10) years following the date [Ring's] employment with [THG-NY] ends for any reason . . . [Ring] shall not (except as expressly authorized in writing by [THG-NY][]) . . . disclose any Confidential Information to any person or entity other than [THG-NY] or another one of the Hilb Companies, unless and until such Confidential Information has become public knowledge without fault by [Ring] or any other individual with confidentiality obligations to [THG-NY] or another one of the Hilb Companies.

(PEA at 11). The CNSA defines "Confidential Information" to "include trade secrets, customer pricing, rates, customer lists, customer leads, supplier pricing, employee compensation arrangements, business practices, plans, policies, secret inventions, processes and compilations of information, drawings and designs, records and specifications, as well as information related to the development of products, costs, management policies, and plans for [THG-NY]." (*Id.*)

Plaintiff argues that when Ring took the Salesforce Photos and used the confidential information therein to "complete the theft of these accounts," he breached the confidentiality provisions in the AAA and CNSA, which prohibited him from using or disclosing Rampart's or THG-NY's confidential information or trade secrets. (Pl.'s Mem. at 19–20; Pl's Reply at 10–11). Defendants contend that none of the information in the Salesforce Photos was confidential or a trade secret because Ring already knew the

19

names of the clients listed, kept the names in his personal phone, and was able to obtain the information from his clients because they either already had it or could request it and provide it to him. (Defs.' Mem. at 32–33; Defs.' Reply at 8–9).

Defendants' arguments fall short. Leaving aside whether the information in the Salesforce Photos constitutes a trade secret, which the Court will address below as to Plaintiff's misappropriation of trade secrets claims, the information in the Salesforce Photos was confidential. First, the content of the Salesforce Photos falls squarely in the definitions of "Confidential Information" in the contracts at issue. It is undisputed that the Salesforce Photos include policy numbers, client codes and coverage codes for new policies written in 2022 for fourteen of Ring's clients. (Defs.' Resp. to Pl.'s 56.1 ¶ 103). Further, it is undisputed that the photos included additional information for three of those fourteen accounts—(1) Cardworks; (2) Victor Morgenstern; and (3) Robyn Morgenstern and Szymon Rosenblatt—including each account's policy number, effective date expiration date, written premium, Ring's individual commission, the type of insurance, and the carrier's name. (*Id.*) Under the confidentiality provisions of the contracts, Ring was prohibited from removing this information from THG-NY. (PEA at 11).

Second, it does not matter whether Ring *could* have obtained the information from his former clients because the fact is he *did not. See IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 240 (E.D.N.Y. 2024) (citing *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 590–91 (2d Cir. 1963)).

As to damages, Plaintiff argues that it has suffered sufficient harm to establish liability because of the loss of client relationships and goodwill. (Pl.'s Mem. at 22). More specifically, Ring has "depriv[ed] THG-NY of both the market value associated with those

20

client accounts, as well as the lost income from those accounts." (Pl.'s Mem. at 22). However, Plaintiff seeks only to establish the damages element, and requests for the Court to have a bench trial as to the amount of damages. (Pl.'s Mem. at 22 n.9, 25). The Court agrees that there is sufficient evidence to establish that Plaintiff was damaged by Ring's breach of the confidentiality provisions of the AAA and CNSA, which is evidenced by THG-NY's clients who left to go to Associated after Ring's resignation.

Because Plaintiff has demonstrated that there is no genuine dispute of material fact, the burden shifts to Defendants to put forward evidence establishing the existence of a question of fact that must be resolved at trial. As analyzed above, Defendants admit that Ring took the Salesforce Photos but argue that the content was not confidential in nature. Construing the facts in the light most favorable to Defendants, the Court finds the record could not lead a rational trier of fact to find for Defendants. *See Brod,* 653 F.3d at 164; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Therefore, the Court concludes that Ring breached the confidentiality provisions of the AAA and CNSA.

C. Ring Breached the AAA's Non-Servicing and Non-Solicitation Provisions

In the operative complaint, Plaintiff asserts that (1) the AAA is a valid and enforceable contract between Rampart, THG-NY, and Ring; (2) the parties exchanged adequate consideration; (3) Rampart and THG-NY performed their obligations, "including paying Ring a substantial amount of money for the account rights he sold;" and (4) Rampart validly assigned the agreement to THG-NY for enforcement against Ring. (Second Am. Compl. ¶¶ 144–48).

21

Article 7.1(b) of the AAA, which was set to end on December 1, 2023, states that Ring cannot:

> (i) solicit the provision of any Business from; (ii) provide or accept any request to provide any Business to; (iii) accept a broker of record letter with respect to; or (iv) otherwise induce the termination or non-renewal of any Business to, any Client included in the Acquired Accounts[10] or any Client of [Rampart] or any other Affiliate of [Rampart], with whom [Ring] had contact during his or her employment with [Ring] or as an independent contractor or employee of [Rampart], or with whom he or she became familiar as a result of such relationships.

(AAA at 9). Plaintiff argues that Ring solicited and serviced all of the clients listed in the "Acquired Accounts" by contacting them regarding his new employment; telling them their policies would transfer to his new employer; preparing and accepting broker of record letters for them, submitting the broker of record letters to make Associated their broker of record; and helping Associated to quote, write new insurance policies, and renew existing policies for them. (Pl.'s Mem. at 21). Defendants argue that Ring did not breach the non-solicitation provision of the AAA because, in the twenty-four months preceding December 1, 2020, which are the parameters for the definition of "Client" in the AAA, he did not provide any insurance services to Daniel and Alexis Siegal, Josh Mangel and Alexandra Rowe, Robyn Morgenstern and Szymon Rosenblatt, Russell and Elizabeth Mollen, or Victor and Faye Morgenstern. (Defs.' Mem. at 27–28).

It is true, and supported by the record evidence, that Ring did not provide insurance services to Josh Mangel and Alexandra Rowe, Robyn Morgenstern and Szymon

---

[10] The "Acquired Accounts" are: (1) Burton and Linda Ruder; (2) Cardworks; (3) Jordan and Jodi Perlmutter; (4) Lawrence and Diane Ruder; (5) Michael and Erica Ruder; (6) Pivot Media; and (7) Stanley and Ricki Ring. (Defs.' Resp. to Pl.'s 56.1 ¶ 36).

Rosenblatt, Russell and Elizabeth Mollen, or Victor and Faye Morgenstern in 2018, 2019, or 2020. (ECF No. 146-53 at 2–3). However, the record evidence shows that Ring provided services to Daniel and Alexis Siegal in 2018, 2019, and 2020, and Defendants admit that Ring serviced Daniel and Alexis Siegal during that time period. (*Id.* at 2; Defs.' Resp. to Pl.'s 56.1 ¶ 39). Further, Defendants fail to address the other clients at issue in this case, who were explicitly listed in the AAA: Cardworks, Burton and Linda Ruder, Lawrence and Diane Ruder, Michael and Erica Ruder, Ricki and Stanley Ring, Gregory Ring and Dana Ruder, Jordan and Jodi Perlmutter, and Pivot Media. (AAA at 19). The record evidence shows that Ring provided services to Burton and Linda Ruder, Cardworks, Jordan and Jodi Perlmutter, Lawrence and Diane Ruder, Michael and Erica Ruder, Pivot Media, and Stanley and Ricki Ring in 2018, 2019, and 2020. (ECF No. 146-53 at 2; Defs.' Resp. to Pl.'s 56.1 ¶ 39). Therefore, the question is whether, on behalf of Associated, Ring solicited or serviced Cardworks, Burton and Linda Ruder, Lawrence and Diane Ruder, Michael and Erica Ruder, Ricki and Stanley Ring, Gregory Ring and Dana Ruder, Jordan and Jodi Perlmutter, Pivot Media, and/or Daniel and Alexis Siegal.

As to servicing, Defendants do not contest that Associated submitted broker of record letters, prepared with the names, policy numbers, and carriers for certain clients that Ring took from the Salesforce Photos. (ECF No. 143-2 ("Defs.' 56.1 Statement") ¶¶ 185–86). As to the clients at issue, Defendants confirm that, in June 2022, Associated submitted a broker of record letter for Cardworks. (*Id.* ¶ 212).

The New York Court of Appeals has held "that solicitation could be found where a seller initiated contact with his former clients or where a seller took affirmative steps to communicate directly with former clients." *USI Ins. Servs. LLC*, 801 F. Supp. 2d at 191–

23

92 (citing *Bessemer Trust Co., N.A. v. Branin*, 949 N.E.2d 462 (2011)). "The Court of Appeals noted that a seller's initiation of contact with former clients was particularly relevant if the seller remained in the same industry." *Id.* at 192. "According to the Court of Appeals, '[t]argeted mailings or . . . individualized telephone calls' to former customers informing them of new business ventures constitute solicitation." *Id.* "Furthermore, if a seller touted his new business venture, even if a former client contacted him first, such action would be considered solicitation." *Id.*

As to solicitation, Defendants do not contest that in June 2022 Ring informed Jordan Perlmutter and, in turn, Pivot Media that he left THG-NY. (Defs.' Resp. to Pl.'s 56.1 ¶ 127). However, the only evidence in the record is Jordan Perlmutter's deposition testimony confirming he emailed Ring's personal email account on June 22, 2022, asking if he should fill out a renewal questionnaire sent by Rampart for Pivot Media's policy and for Ring's new work email address. (ECF Nos. 141-140 ("Perlmutter Dep.") at 29:19–32:7; 141-141 at 2–3). This alone does not fit New York's definition of solicitation.

In June 2022, Ring emailed Burton and Linda Ruder informing him of his new position at Associated, asking for Ruder's policy information to "prepare the paperwork and transfer the policies over to me." (Defs.' Resp. to Pl.'s 56.1 ¶ 141; ECF 141-64 at 2). In the email, Ring wrote: "nothing about the coverage of premium will change." (ECF 141-64 at 2). Defendants do not present evidence to refute that Ring solicited Burton and Linda Ruder but, rather, argue that the contract is unenforceable, an argument which the Court has already rejected. This fits New York's definition of solicitation because it unequivocally shows that Ring "took affirmative steps to communicate directly" with Burton and Linda Ruder. *USI Ins. Servs. LLC*, 801 F. Supp. 2d at 191–92.

24

Plaintiffs make no specific accusations concerning Ring's solicitation or servicing of Lawrence and Diane Ruder, Michael and Erica Ruder, Ricki and Stanley Ring, Gregory Ring and Dana Ruder, Pivot Media, or Daniel and Alexis Siegal. Therefore, the Court is unable to evaluate whether Ring breached the AAA as to these clients. Construing the facts in the light most favorable to Defendants, the Court finds the record could not lead a rational trier of fact to find for Plaintiff as to these clients. *See Brod,* 653 F.3d at 164; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

As to damages, again, Plaintiff argues that it has suffered sufficient harm to establish liability because of the loss of client relationships and goodwill, and seeks only to establish the damages element, requesting that the Court have a bench trial as to the amount of damages. (Pl.'s Mem. at 22 n.9, 25).

Therefore, the Court concludes that Ring breached the non-solicitation and non-servicing provision of the AAA as to Burton and Linda Ruder, and Cardworks.

D.  Ring Breached the CNSA's Non-Servicing and Non-Solicitation Provisions

Plaintiff argues that (1) the CNSA is a valid and enforceable contract between the Hilb Group and Ring; (2) the parties exchanged adequate consideration; (3) the non-servicing and non-solicitation restrictions are "no greater than necessary" to protect the Hilb Group's legitimate business interests; and (4) Ring's conduct during and after his employment constitutes a breach of his obligations under the CNSA. (Second Am. Compl. ¶¶ 158–69).

Under the terms of the CNSA, both during his employment and for two years following his termination from THG-NY, Ring was prohibited from soliciting or servicing

25

clients with whom he worked for the two years leading up to his June 21, 2022, resignation. (PEA at 12). The CNSA states:

> [D]uring [Ring's] employment with [THG-NY] and for a period of two (2) years immediately following the termination of [Ring's] employment for any reason, [Ring] shall not directly or indirectly, on behalf of [Ring] or on behalf of any other individual or entity:
>
>> A. contact, solicit, or assist in the solicitation of any of [THG-NY's] Customers . . . for the purpose of selling or providing any Competitive Products or Services . . . ;
>> B. sell or provide any Competitive Products or Services . . . to any of [THG-NY's] Customers . . . ; or
>> C. intentionally induce or attempt to induce any of [THG-NY's] Customers to cease doing business in whole or in part with [THG-NY].

(*Id.*)

Ring had contact or communication with, and brokered or renewed insurance policies, between December 1, 2020 and June 21, 2022, for the following THG-NY clients: (1) Burton and Linda Ruder; (2) Cardworks, Inc.; (3) Daniel Siegel and Alexis Siegel; (4) Jordan and Jodi Perlmutter; (5) Lawrence and Diane Ruder; (6) Michael and Erica Ruder; (7) Pivot Media; (8) Stanley and Ricki Ring; (9) Josh Mangel and Alexandra Rowe; (10) Robyn Morgenstern and Syzmon Rosenblatt; (11) Russell and Elizabeth Mollen; and (12) Victor Morgenstern (Defs.' Resp. to Pl.'s 56.1 ¶ 68), making them the client group at issue.

Defendants confirm that, in June 2022, Associated submitted broker of record letters for Cardworks, Russell and Elizabeth Mollen, Josh Mangel and Alexandra Rowe, Victor and Faye Morgenstern, and Robyn Morgenstern and Syzmon Rosenblatt. (Defs.' 56.1 Statement ¶ 212). This is a clear violation of the CNSA's non-solicitation provision, which prohibited Ring from "intentionally induc[ing] or attempt[ing] to induce any of [THG-NY's] Customers to cease doing business in whole or in part with [THG-NY]." (PEA at 12).

26

As to solicitation, as already analyzed above, Ring's email communications with Burton and Linda Ruder constituted solicitation. *See USI Ins. Servs. LLC*, 801 F. Supp. 2d at 191–92; (Defs.' Resp. to Pl.'s 56.1 ¶ 141; ECF 141-64 at 2). And the evidence in the record could not lead a rational trier of fact to conclude that Ring solicited Jordan Perlmutter. (Defs.' Resp. to Pl.'s 56.1 ¶ 127; Perlmutter Dep. at 29:19–32:7; ECF No. 141-141 at 2–3).

Plaintiffs make no specific accusations concerning Ring's solicitation or servicing of Daniel Siegel and Alexis Siegel, Lawrence and Diane Ruder, Michael and Erica Ruder, Stanley and Ricki Ring, or Pivot Media. Again, construing the facts in the light most favorable to Defendants, the Court finds the record could not lead a rational trier of fact to find for Plaintiff as to these clients. *See Brod,* 653 F.3d at 164; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

As to damages, again, Plaintiff argues that it has suffered sufficient harm to establish liability because of the loss of client relationships and goodwill, and seeks only to establish the damages element, requesting that the Court have a bench trial as to the amount of damages. (Pl.'s Mem. at 22 n.9, 25).

The Court concludes that Ring breached the non-solicitation provision of the CNSA as to Cardworks, Burton and Linda Ruder, Russell and Elizabeth Mollen, Josh Mangel and Alexandra Rowe, Victor and Faye Morgenstern, and Robyn Morgenstern and Syzmon Rosenblatt.

Accordingly, THG-NY's motion for summary judgment with respect to its breach of contract claim against Ring as to Cardworks, Burton and Linda Ruder, Russell and Elizabeth Mollen, Josh Mangel and Alexandra Rowe, Victor and Faye Morgenstern, and

27

Robyn Morgenstern and Syzmon Rosenblatt is granted, and Defendants' cross-motion as to those clients is denied. Defendants' cross-motion for summary judgment as to breach of contract as to Jordan and Jodi Permutter, Pivot Media, Daniel Siegel and Alexis Siegel, Lawrence and Diane Ruder, Michael and Erica Ruder, and Stanley and Ricki Ring is granted, and Plaintiff's motion as to those clients is denied.

II.      Breach of Duty of Loyalty

"Under New York law, an employee owes a duty of good faith and loyalty to his employer." *Nuveen Servs., LLC v. Fuller*, No. 23 Civ. 9942 (LTS) (GS), 2024 WL 4264864, at *13 (S.D.N.Y. Aug. 1, 2024). "A breach of the duty of loyalty is actionable as a breach of fiduciary duty." *Id*. (citation omitted). "A claim for breach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the defendant; (2) a breach of that duty; and (3) resulting damages." *Id.* (citation omitted). A breach of the duty of loyalty "may occur when an employee commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, [or] solicitation of employer's customers before cessation of employment." *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 204 (E.D.N.Y. 2024).

Ring signed an offer letter with Associated on June 20, 2022, resigned from THG-NY on June 21, 2022, and began working at Associated on June 22, 2022. (Defs.' Resp. to Pl.'s 56.1 ¶¶ 110, 117, 122).

Plaintiff argues that Ring breached the duty of loyalty by, before his resignation from THG-NY, (1) taking the Salesforce Photos; (2) forwarding information about a THG-NY client to his personal email; (3) informing THG-NY clients of his plans to leave; and

28

(4) providing client information to Associated employees to prepare broker of record letters. (Pl.'s Mem. at 25).

Defendants contend that none of these actions constitute a breach of the duty of loyalty. (Defs.' Mem. at 36–38). First, none of the information in the Salesforce Photos was confidential. (*Id.* at 36). Second, the information Ring forwarded to himself concerned a friend (Jason Ederrer) who was never a THG-NY client and who THG-NY is not seeking damages for regarding this case. (*Id.* at 37). Third, Plaintiff identifies only one client—Cardworks—that Ring told he was planning to leave THG-NY. (*Id.* at 37–38). And Ring merely told Cardworks of his plans to leave, which does not breach the duty of loyalty. (*Id.*) Finally, the information Ring provided to Associated was not confidential. (*Id.* at 38).

As a matter of law, Ring taking the Salesforce Photos constituted a breach of the duty of loyalty. In *McKinnon Doxsee Agency, Inc. v. Gallina*, the Second Department found that Defendant's copying of "large files of client information from his work computer prior to his resignation from his employment" constituted a breach of his duty of loyalty. 187 A.D.3d 733, 736–37 (2nd Dep't 2020)*; see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521–22 (S.D.N.Y. 2011) (citing *Ashland Mgmt. Incorp. v. Altair Invs. NA,* 59 A.D.3d 97, 106 (1st Dep't 2008) ("Although an employee may, of course, make preparations to compete with his employer while still working for the employer, he . . . may not copy his employer's business records for his own use[.]"). "[E]ven in the absence of trade secret protection, employees are not permitted to copy their employer's client list, and such acts have been deemed to be an 'egregious breach of trust and confidence.'" *Pure Power Boot Camp, Inc.*, 813 F. Supp. 2d at 522 (quoting *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392 (1972)).

29

During his deposition, Ring was asked where he got the customer names, policy numbers, and insurance carriers to prepare the broker of record letters at Associated, to which he answered, "From the pictures I took on Salesforce." (ECF No. 141-33 ("Ring Dep.") at 169:14–171:8). Because Plaintiff has demonstrated that there is no genuine dispute of material fact that Ring breached his duty of loyalty to THG-NY by taking the Salesforce Photos during his employment, the burden shifts to Defendants to put forward evidence establishing the existence of a question of fact that must be resolved at trial. Defendants have not done so.

Accordingly, THG-NY's motion for summary judgment with respect to its breach of the duty of loyalty claim against Ring is granted, and Defendants' cross-motion for on that claim is denied.

III.    Aiding and Abetting Breach of Duty of Loyalty

"Under New York law, a claim for aiding and abetting a breach of fiduciary duty requires the following elements: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *TileBar*, 723 F. Supp. 3d at 205 (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011). "Additionally, the claimant must show that the alleged aider and abettor provided 'substantial assistance' to the breaching party." *Id.* (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003). "Substantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* "The mere inaction of an alleged aider and abettor constitutes

30

substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff."
*Id.*

Plaintiff argues that Associated aided and abetted Ring's breach of his duty of loyalty because Associated not only knew about Ring's breach and failed to stop it, but also requested and encouraged the conduct. (Pl.'s Mem. at 25–26). Plaintiff contends that Associated met with Ring to discuss his nerves about accepting the position (promising to indemnify him against litigation), assisted him in planning his resignation, directed him to prepare broker of record letters before he began working at Associated, knew that Associated employees were preparing broker of record letters using information Ring took from THG-NY, and directed Associated employees to issue broker of record letters for clients it knew Ring was precluded from soliciting or servicing. (*Id.*)

As an initial matter, Defendants argue that Plaintiff's claim is confined to pre-resignation conduct because Plaintiff's second amended complaint makes allegations only as to Ring's breach of his duty of loyalty while still working at THG-NY, not once he began working at Associated. (Defs.' Mem. at 40). Defendants argue that Plaintiff's aiding and abetting claim fails because Ring did not breach any duty of loyalty and, even if he did, Plaintiff has not shown that Associated substantially assisted in an alleged breach. (*Id.* at 38–39). They argue that Associated did not know Ring had taken the Salesforce Photos. (*Id.*) Further, Associated did not ask Ring to contact clients before resigning from THG-NY and did not know that he contacted clients before resigning form THG-NY. (*Id.* at 40). Also, even if Associated directed Ring or Associated employees to prepare and send broker of record letters after Ring resigned, that conduct falls outside of the second amended complaint. (*Id.*) Finally, it is irrelevant whether Associated instructed Ring to

31

abide by Plaintiff's restrictive covenants because "the mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." (*Id.*)

In reply, Plaintiff argues: "That some (but not all) of Associated's encouragement for Ring to breach his fiduciary duties—including, directing him to submit [broker of record letters]—occurred after Ring resigned from THG-NY does not preclude liability." (Pl.'s Reply at 25). However, Plaintiff fails to direct the Court to any specific evidence that Associated "substantially assisted" Ring in breaching his duty of loyalty *before* his resignation from THG-NY. *TileBar*, 723 F. Supp. 3d at 205.

Defendants are correct that the second amended complaint only alleges that Associated aided and abetted Ring's breach *before* his resignation. (Second Am. Compl. ¶¶ 190–93) (alleging that by "instructing, directing, and encouraging Ring to solicit THG-NY's customers on Associated's behalf *before his resignation*, Associated knowingly induced and/or participated in Ring's breach of his duty of loyalty to THG-NY") (emphasis added). And Defendants cite to deposition testimony that Schrayer and Herz had no knowledge of the Salesforce Photos, did not instruct Ring to inform his THG-NY clients that he was leaving to go to Associated, and did not know that Ring contacted clients prior to his resignation. (ECF No. 143-8 ("Schrayer Dep.") at 95:5–19, 98:9–23; ECF No. 143-7 ("Herz Dep.") at 141:17–142:13; 146:10–20).

Because Defendants have demonstrated that there is no genuine dispute of material fact as to Associated's lack of participation in Ring's alleged pre-resignation breaches, the burden shifts to THG-NY to put forward evidence establishing the existence of a question of fact that must be resolved at trial. Plaintiff failed to adduce sufficient

32

evidence of a genuine dispute of material fact that Associated "knowingly induced or participated in the breach" and "provided substantial assistance" before Ring resigned from THG-NY. *TileBar*, 723 F. Supp. 3d at 205. Construing the facts in the light most favorable to Plaintiff, the Court finds the record could not lead a rational trier of fact to find that Associated aided and abetted Ring's breach of his duty of loyalty to THG-NY before he resigned. *See Brod,* 653 F.3d at 164; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

Accordingly, THG-NY's motion for summary judgment with respect to its aiding and abetting breach of duty of loyalty claim against Associated is denied, and Defendants' cross-motion for summary judgment as to aiding and abetting breach of duty of loyalty is granted.

IV.    Tortious Interference with Contract

"Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *TileBar*, 723 F. Supp. 3d at 201 (citing *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir. 2001). "The plaintiff also must allege that the contract would not have been breached 'but for' the defendant's conduct." *Id.* (citing *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019).

Defendants contend, among other things, that there is no evidence that Associated asked Ring to take the Salesforce Photos or, further, to use them as an employee at Associated. (Defs.' Mem. at 34–36). Plaintiff has failed to present any argument to demonstrate that Associated was the "but for" cause of Ring's breaches of the AAA and

33

CNSA. Because "but for" causation is a required element of Plaintiff's tortious interference claim, Defendants are entitled to summary judgment as to this claim. Therefore, the Court will not address the other required elements.

Accordingly, THG-NY's motion for summary judgment with respect to its tortious interference with contract claim against Associated is denied, and Defendants' cross-motion for summary judgment on that claim is granted.

V.   <u>Misappropriation of Trade Secrets</u>

"The elements required under the DTSA and New York law are fundamentally the same and district courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." *TileBar*, 723 F. Supp. 3d at 190 (citation and brackets omitted). "To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Id.*

A. There is a Genuine Dispute of Material Fact as to Whether the Compiled <u>Account Information in the Salesforce Photos Is a Trade Secret</u>

Under the DTSA, "trade secret" includes "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," if (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). "The

34

existence, *vel non*, of a trade secret usually is treated as a question of fact, and properly the province of the jury." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (citation omitted). "That said, summary judgment may be appropriate where it is clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known." *Id.* (citation omitted).

In determining whether information qualifies as a trade secret under either the DTSA or state law, New York courts typically consider the following six factors:

> (1) [T]he extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*TileBar*, 723 F. Supp. 3d at 191.

Plaintiff argues that the compiled account information in the Salesforce Photos is a trade secret because it is kept only on THG-NY's password-protected systems and is unavailable to the public. (Pl.'s Mem. at 27–28). THG-NY has taken measures to keep the information secure, including password protecting Salesforce and requiring multifactor authentication, disabling the function to print the compiled account information, requiring confidentiality and nondisclosure agreements, and disabling system access when an employee is terminated. (*Id.* at 28). Further, the information would be valuable to a competitor and difficult for a competitor to duplicate. (*Id.* at 28–30).

Defendants contend that the information in the Salesforce Photos is not a trade secret because trade secret protection does not attach when customer information can be obtained from customers. (Defs.' Mem. at 41–42). Further, Ring's supervisor sent Ring

35

and all the other Rampart producers even more detailed information than contained in the Salesforce Photos to their personal email accounts years earlier. (*Id.* at 42–43).

Because it is not "clear that the information at issue is not actually secret or there is no discernible economic value from that information not being generally known," *Better Holdco, Inc.*, 666 F. Supp. 3d at 384, the Court finds that there is a genuine dispute of material fact that must be resolved at trial and, therefore, summary judgment to either party is inappropriate.

Accordingly, the parties' cross-motions with respect to THG-NY's misappropriation of trade secrets claim are denied.

## **CONCLUSION**

For the reasons set forth above, the parties' cross-motions for summary judgment are granted in part and denied in part and Defendants' cross-motion for summary judgment is granted in part and denied in part. THG-NY's motion is granted with respect to Counts I and II (breach of contract), and III (breach of duty of loyalty). Defendants' motion is granted with respect to Counts IV (tortious interference) and V (aiding and abetting). The motions are denied in all other respects.

The parties are directed to meet and confer to discuss a bench trial on damages for Counts I–III (breach of contract and breach of duty of loyalty), and liability and damages for Counts VI and VII (misappropriation of trade secrets). The parties are further directed to appear for a virtual status conference on April 2, 2026, at 12:00 PM. The attorneys listed on the docket will receive an invitation link.

SO ORDERED.


/s/ Ramón E. Reyes, Jr.

RAMÓN E. REYES, JR.
United States District Judge

Dated: March 26, 2026
        Brooklyn, New York